# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| JAMES A. SAVOIE and | : | Bankruptcy No. 05-13263DWS |
| JENNIFER M. SAVOIE, | : | |
| | : | |
| Debtors. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Motion of the United States Trustee ("UST") to Dismiss Pursuant to 11 U.S.C. § 707(b). An evidentiary hearing was held on September 12, 2005 at which the debtor James A. Savoie ("James") testified. Based on that testimony and the documentary evidence elicited, the Motion will be granted. However, my order of dismissal shall not become effective for ten (10) days to allow the Debtors to convert their case to one under Chapter 13.

**BACKGROUND**

James and Jennifer Savoie ("Jennifer") have been struggling with their debts for ten of the twelve years of their marriage. They have lived up to the limits of their joint salaries and reacted to the three periods of Jennifer's unemployment[1] by funding their living expenses

---

[1] The first was a voluntary hiatus from work for one year when their daughter Caroline was
(continued...)

with credit cards. In 1995, their credit card debt was $14,000; when they left New York in 2000 it had escalated to $26,000.

James has a graduate degree in theater and has completed all his course work for a PhD. He testified that he still hopes to complete his dissertation and earn his degree although it does not appear that this goal is associated with future employment. His extensive education has left him with substantial unpaid student loans. Both he and Jennifer who are college administrators take home a monthly combined income of $6,168 but carry expenses of $6,080. The present crux of the problem is the amount of funds that are allocated to the education and care of their nine year old daughter Caroline in addition to their regular expenses and continuing student loan debt.[2]

According to James, upon their relocation from New York to Philadelphia in 2000, they secured rental housing in the Main Line suburb of Narberth. Their daughter was too young to be enrolled in the Lower Merion school district, so they enrolled her in the local Catholic school. When their lease expired, they purchased a house in Philadelphia, concluding that the housing cost would be no greater and maybe less than a lease renewal. That cost is $1,019.00 per month exclusive of real estate taxes and insurance. Exhibit T-1. While there was a public school in their new neighborhood, they discovered that a high

---

(...continued)
born in 1995. The second occurred when they relocated to Philadelphia in May 2000. It was not clear if her unemployment for six months prior to taking a position with Philadelphia International Marketing ("Marketing") was likewise by choice. However, Marketing down- sized her position in May 2002 and she could not find work until January 2003.

[2] In 1995 James' student loans were consolidated and restated at $60,000. They went in and out of forbearance but continued to accrue interest at all times. The present obligation is $91,000.

percentage of the students were reading below grade level and there was no gifted program available for Caroline who had been tested and found to be in the 90 to 98th percentile. Exhibit D-1 and D-2. Rather than continue with a parochial school education which they were not comfortable with, they elected to enroll her in the William Penn Charter School which was near James' work and their home.  She did not thrive well her first year, being angry at her parents' school choice and requiring counseling for social issues.  However, she is now flourishing both academically and socially. The annual cost of her tuition only, which increases in the higher grades, is presently $15,250.  Exhibit D-3.  However, that amount is just one part of the cost of educating Caroline.  In 2003, Jennifer withdrew $32,000 from her pension in order to raise the $22,000 they spent on Caroline's education.[3]  In addition to the academic year tuition, the parents continue Caroline's Penn Charter experience with its after school program that costs $900 per trimester[4] and a summer camp program that costs $1,500. The latter is supplemented by a college student babysitter at $250 per week since the camp does not cover the entire school vacation and both parents work.  Noting that the camp at Baldwin, another exclusive private school, was even more expensive, James nonetheless conceded that he had not investigated any less costly summer camps or child care.

Debtors' monthly net income is $6,168.00.  Exhibit T-1 (Schedule I).  Their monthly expenses total $6,080.  Id. (Schedule J).  The budget reflects monthly school tuition and

---

[3] While the early withdrawal resulted in a $10,000 penalty and therefore loss of Jennifer's own retirement funds, they nonetheless made a $500 contribution to the Penn Charter faculty retirement plan. When questioned about making this voluntary contribution, James stated that he felt social pressure to do so but had discontinued the practice the second year.

[4] Schedule F indicates that they failed to pay Penn Charter $1,000 on account of that program.

expenses of $1,220 and child care, including camp, dance and music school of $425, aggregating $19,740 per year. Caroline, while a bright girl who obviously benefits from this education, has no special needs that require it. Debtors' monthly budget also includes $160 for telephone, $68 for internet and cable, $200 for recreation, $70 for charitable contributions, $300 for clothing, $560 for food, $100 for personal care. These and their other expenditures leave no dollar available for payment to creditors other than their mortgage, car loan and student loan,[5] debts that are secured or non-dischargeable.

**DISCUSSION**

The United States Trustee seeks to dismiss this Chapter 7 case pursuant to § 707(b) for "substantial abuse."[6] Section 707(b) was enacted in response to pressure from retailers and consumer lenders who complained of an increased number of Chapter 7 bankruptcy filings by "non-needy" debtors. See Green v. Staples (In re Green), 934 F.2d 568, 571 (4th Cir. 1991). Congressional intent behind the passage of § 707(b) was to restrict the use of chapter 7 by petitioners not in need of relief or acting in bad faith. S. Rep. No. 989, 95th

---

[5] They owe $91,000 to Sallie Mae according to Debtor's Schedules. The budget allocates $750 per month for this non-dischargeable obligation.

[6] Bankruptcy Code § 707(b) provides as follows:

(b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

There is no dispute that the debts are primarily consumer debts in this case.

Cong., 2d Sess. 94 (1978).[7] While debtors should be afforded a "fresh start", the rights of unsecured creditors to repayment of their debts where debtors can pay the debts without undue burden must be protected. Zolg v. Kelly (In re Kelly), 841 F.2d 908, 914 (9th Cir. 1988).

The trustee has the burden of proving that the granting of relief would be a "substantial abuse" of Chapter 7. In re Woodhall, 104 B.R. 544, 545 (Bankr. M.D. Ga. 1989). The Bankruptcy Code does not elaborate on what constitutes substantial abuse under § 707(b). See In re Walton, 866 F.2d 981, 983 (8th Cir. 1989). Legislative history suggests, and case law teaches, that dismissal under § 707(b) for substantial abuse "can be predicated upon either lack of honesty or want of need." In re Krohn, 886 F.2d 123, 126 (6th Cir. 1989). In other words, dismissal of a case under § 707(b) may be warranted where, considering the totality of the circumstances, the debtor is acting in bad faith or where the debtor has the ability to repay a substantial portion of its unsecured debt. See United States Trustee v. Harris, 960 F.2d 74 (8th Cir. 1992).

The Sixth Circuit Court of Appeals set forth the following factors to be considered when determining whether a case should be dismissed under § 707(b) because the debtor has the ability to repay a substantial portion of its debt:

(a) whether the debtor has the ability to repay debts out of his future income;

(b) whether the debtor enjoys a stable source of income;

(c) whether he is eligible for adjustment of debts through Chapter 13 planning;

---

[7] Of course, Congress has radically changed § 707(b) by establishing a presumption of abuse when a "means test" is triggered. The amendment to the law becomes effective on October 17, 2005 and is not applicable here.

>   (d) whether there are state remedies with potential to ease the financial predicament and the degree of relief obtainable through private negotiations; and
>
>   (e) whether expenses can be reduced significantly without depriving debtor of adequate food, clothing, shelter, and other necessities.

In re Krohn, 886 F.2d at 126-27.[8]  In Green, supra, the Court identified the relevant factors as (a) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (b) whether debtor incurred cash advances and made consumer purchases far in excess of its ability to pay; (c) whether debtor's schedules and statements of current income and expenses reasonably reflect the true financial condition; (d) whether the debtor's proposed family budget is excessive or unreasonable and (e) whether the petition was filed in good faith.  Notably in each case the reasonableness of the debtor's expenditures is a material factor in the court's analysis.

The court in In re Walsh, 287 B.R. 154, 156 (Bankr. D. N.C. 2002), cogently explained the position I find myself in when it noted that while it did not want to make lifestyle decisions for debtors, "it would be patently unfair for the debtors to continue to make lifestyle choices that ignore their obligations to creditors."[9]  The discomfort I feel is exacerbated because the Debtors' motives are pure.  They wish what every parent wishes, i.e., to provide their child with an education that will maximize her potential so that she may

---

[8] In Krohn, the chapter 7 case was dismissed because court found that "the debtor had ample future income, his financial situation was not the product of an unforseen or catastrophic event, and . . . good, old-fashioned belt tightening was available to the debtor . . ."

[9] In Walsh, the debtors placed each of their three children in private school ($1,750 per month or $17,500 for the academic year), spent $600 for recreation and clubs (including a country club membership, private piano lessons and $300 for hockey fees), $850 for food, and $1,800 in rent.

-6-

enjoy a rich and productive life. However, they have pursued this goal without regard to their responsibility for the debts they have incurred and the limitations of their joint income. With admitted outstanding and growing credit card debt, Debtors chose housing that they found compelled them to seek private school education for their daughter and then selected the best schooling they could find without regard to cost. They supplemented Caroline's already expensive tuition with after school care and camp and private dance and music lessons, and appear to have no intention of compromising the quality and concomitant cost of the education and enrichment being provided to her.

James stresses that his family lives a modest lifestyle but for their commitment to educate their daughter at Penn Charter. While I would agree that they are not extravagant in their expenditures except for the amount they spend on Caroline, they clearly also have the ability to decrease their spending which is anything but modest. However, James does not appear to recognize any responsibility to conserve resources to allow them to provide Caroline with the costly education she is enjoying. I can discern no belt tightening on the Debtors' part to compensate for the large education expenditures. Rather the Debtors have made the choice to have their creditors pay for their daughter's expensive education without realizing any of the pain themselves. While it is not clear to me that the Debtors could sufficiently reduce their expenses to afford Caroline's present education and enrichment program, it is clear that they have made no attempt to do so. When I asked James how he was going to pay his non-dischargeable debts and maintain the education expense that the couple are committed to, James had no credible answer.

In short, I conclude that Debtors have a stable source of income exceeding $100,000 for the past three years. Their expenses can be reduced significantly without depriving them of adequate food, shelter or other necessities. Their bankruptcy petition was not filed because of any sudden illness, disability or unemployment[10] but rather is the consequence of years of spending beyond their means, a practice which is not addressed in this bankruptcy case. While they certainly need bankruptcy relief from the sizeable credit card debt they have accumulated, the nature of the relief they seek is not only unfair to their creditors but ineffective to address their financial problems. The Debtors need financial counseling which will enable them to formulate a realistic budget and a plan for paying their creditors. If they are prepared to make the difficult decisions that such a plan requires, they could do so in a Chapter 13 case. However, I will not allow this Chapter 7 case to proceed under these circumstances.

The Debtors have requested that they be given the opportunity to convert their case to one under Chapter 13 should I grant the UST's motion. The UST objects and argues that I am compelled to dismiss. I respectfully disagree. As the Debtors are not precluded from filing a petition under Chapter 13, so they are not precluded from requesting conversion. The Chapter 7 case is being dismissed as a substantial abuse since the Debtors have not committed to use their future income to pay their creditors. An agreement to do so by

---

[10] While there have been periods during the Savoie's ten years of financial distress that Jennifer did not work, I do not view them to be the precipitating cause of the bankruptcy. While a steady second income would have reduced their reliance on credit card debt, the evidence is that they had significant credit card debt in 1995 before any interruption in Jennifer's work. While it grew to $26,000 by the time the Debtors left New York in 2000, it appears that the one year hiatus Jennifer took from the workplace in 1995 when Caroline was born which no doubt contributed to their financial problems was by choice.

undertaking a Chapter 13 plan is the desired objective of § 707(b), and thus it is counterintuitive not to grant their request. However, the *quid pro quo* of the continuation of this bankruptcy case is the filing of a Chapter 13 plan that reflects a significant reduction in their spending, including a reassessment of the education plan for Caroline consistent with their other obligations. In that connection, Debtors are urged to obtain personal financial management education to develop a realistic and workable budget.[11]

An Order consistent with the foregoing Memorandum Opinion shall be entered.

DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated:  October 6, 2005

---

[11] Such an undertaking is a requirement of an individual debtors seeking a discharge in cases filed after October 17, 2005 when the Bankruptcy Abuse Prevention and Consumer protection Act of 2005 becomes effective. 11 U.S.C. § 1328(g).

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| JAMES A. SAVOIE and | : | Bankruptcy No. 05-13263DWS |
| JENNIFER M. SAVOIE, | : | |
| | : | |
| Debtors. | : | |

# **O**RDER

**AND NOW**, this 6th day of October 2005, upon consideration of the Motion of the United States Trustee to Dismiss ("Motion") Pursuant to 11 U.S.C. § 707(b), after notice and evidentiary hearing and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that the Motion is **GRANTED** provided, however, that the Debtors will be given the opportunity to convert this case to one under Chapter 13. If no motion to convert is filed within ten (10) days, this case shall be dismissed.

                                              DIANE WEISS SIGMUND
                                              Chief U.S. Bankruptcy Judge

<u>Copies to</u>:

Eric L. Frank, Esquire
DIDONATO & WINTERHALTER
1818 Market Street
Suite 3520
Philadelphia, PA 19103

George M. Conway, Esquire
Office of the U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia, PA 19107

William C. Miller, Esquire
Standing Chapter 13 Trustee
P. O.  Box 40119
Philadelphia, PA 19106-0119

Gary Francis Seitz, Esquire
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE  19899