**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| JAMES A. SAVOIE and | : | Bankruptcy No. 05-13263DWS |
| JENNIFER M. SAVOIE, | : | |
| | : | |
| Debtors. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Debtors' motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure,[1] for reconsideration of this Court's Order dated October 16, 2005 (the "Motion") granting the Motion of the United States Trustee to Dismiss this Chapter 13 case for substantial abuse pursuant to § 707(b). See In re Savoie, 2005 WL 2476268 (Bankr. E.D. Pa. Oct. 6, 2005) ("Savoie I"). A hearing was held on the Motion and post-hearing memoranda have been filed. Accordingly, the matter is ripe for decision.[2] For the reasons that follow, the Motion shall be denied.

---

[1] While neither Debtor's Motion nor its post-hearing memorandum of law in support of its motion ("Debtor's Post-Hearing Memorandum") identify the rule upon which Debtor's motion is based, Debtor's counsel stated at the hearing that "it's a Rule 59(e) motion." See Transcript, dated Nov. 14, 2005 ("Transcript"), at 3.

[2] As the Debtors contended, *inter alia*, in their Motion and at the hearing that this Court misapprehended the factual evidence which was presented at the hearing on the motion for dismissal ("Dismissal Motion"), they were given the opportunity to order the transcript from the Dismissal Motion hearing, and both parties were given time thereafter to file memoranda in support of their respective positions.

**BACKGROUND**

The facts contained in the Background section of my Memorandum Opinion in Savoie I are incorporated herein. While Debtors requested the opportunity to supplement the factual record which they made on the Dismissal Motion and upon which I based my Opinion in Savoie I, I denied this request from the bench. I provide my reasons for doing so in Part II of my discussion below.

In support of the Motion, Debtors argue that, to the extent I relied in Savoie I upon their prepetition conduct as evidence of substantial abuse of the Bankruptcy Code, I misapprehended the evidence in the record and erred as a matter of law. Debtors contend that there is nothing in the record concerning their prepetition conduct that distinguishes them from thousands of other debtors who, in good faith and honesty, have made questionable economic decisions causing them to need the relief offered by a Chapter 7 discharge. Rather they contend that the "real issue" in the case is whether, under the "totality of the circumstances" test, their private school tuition expenditure on behalf of their daughter, constitutes substantial abuse of the Bankruptcy Code under § 707(b). In short, they assert that I erred in finding "substantial abuse" under § 707(b) given the particular needs of their daughter, the educational alternatives, their frugal lifestyle and their good faith in other respects.

**DISCUSSION**

I.

A motion for reconsideration is governed by Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 59(e),[3] which is applicable in bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure 9023. The scope of Rule 59(e) is very narrow. Miller v. USA Waste Services, Inc. (In re Eagle Enterprises, Inc.), 259 B.R. 73, 77 (Bankr. E.D. Pa. 2001). "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 908 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986). "Federal district courts should grant such motions sparingly because of their strong interest in finality of judgment." Seleras v. M/V Cartagena de Indias, 959 F. Supp. 270, 272 (E.D. Pa. 1997) (*quoting* Continental Cas. Co. v. Diversified Indus., Inc., 884 F.Supp. 937, 943 (E.D. Pa. 1995)). As the district court explained in Keyes v. National Railroad Passenger Corporation, 766 F. Supp. 277 (E.D. Pa. 1991):

> The purpose of a Rule 59(e) motion is to allow the court to reevaluate the basis of its decision. ... Motions for reconsideration are not at the disposal of an unsuccessful party to "rehash" the same arguments and facts previously presented.

Id. at 280 (citations omitted). See also Reich v. Compton 834 F.Supp. 753, 755 (E.D. Pa. 1993), aff'd in part, rev'd in part on other grounds, 57 F.3d 270 (3rd Cir. 1995). The court in Durkin v. Taylor, 444 F.Supp. 879, 889 (E.D. Va. 1977), stated that "[w]hatever may be

---

[3] Fed.R.Civ.P. 59(e) provides as follows:

"(e) Motion to Alter or Amend a Judgment. A motion to alter or amend the judgment shall be served not later than ten days after entry of the judgment."

the purpose of Rule 59(e) it ... [was not] ... intended to give the unhappy litigant one additional chance to sway the judge." A party may not submit evidence that is not newly discovered in support of a motion for reconsideration. Harsco, 779 F.2d at 909.

> To constitute newly discovered evidence for which a new trial may be granted under Rule 59(a), the evidence must pertain to facts in existence at the time of the trial, and not to facts that have occurred subsequently. ... To warrant a new trial the evidence must not have been known to the movant at the time of the trial; and, moreover, the movant must have been excusably ignorant of the facts, i.e., the evidence must be such that it was not discoverable by diligent search.

6A Moore, Moore's Federal Practice ¶59.08[3], at 59-101 to 59-102 (2d ed. 1995) (citations omitted).

## II.

Debtors contend that, in Savoie I, I relied too heavily upon their prepetition conduct in concluding that it would be a "substantial abuse" to grant them relief under Chapter 7 of the Code. As I noted above, Debtors requested the opportunity, which I denied at the hearing, to supplement the record on the issue of their prepetition conduct. Presumably they made this request based on their view that their additional evidence on this issue, specifically the additional facts ("Additional Facts") which they set forth in their Motion and Post-Hearing Memorandum, would change my impression of their prepetition behavior and, consequently, my decision to grant the Motion. However, the Additional Facts do not satisfy the standard for "newly discovered evidence" under Rule 59 because they were known by the Debtors when I issued my decision in Savoie I, and as noted above, a party may not submit evidence that is not newly discovered in support of a motion for reconsideration.

-4-

Moreover, even *assuming* for the sake of argument that I allowed the record to be supplemented to include the Additional Facts, my decision to grant the Motion would remain the same. The Additional Facts do not alter the aspect of Debtors' pre-petition behavior that was *most* relevant to my decision in Savoie I, namely the Debtors' expenditures for the education and enrichment of their daughter given the amount of their debt and the limitations of their income.[4] As I concluded in Savoie I, under the totality of circumstances, granting relief to Debtors under Chapter 7 would be a "substantial abuse" of that chapter's provisions.

III.

Debtors contend that the "real issue" in this case is whether their expenditure of private school tuition for their daughter can be deemed "substantial abuse" under § 707(b).[5] While this issue is not the *sole* issue in this case, see Part IV below, it is a *major* issue. If I made an error regarding this issue in Savoie I, it was not an error of fact or law, but rather articulation. Because of my discomfort with stating that parents who want the best education

---

[4] The Additional Facts contain examples, which were not provided at the hearing on the Dismissal Motion, of additional efforts by the Debtors to contain their expenses such as eliminating all air travel, deferring maintenance on their home and deferring dental work for Mr. Savoie. See Motion ¶ 14(d). However, as I noted above, these Additional Facts do not affect my view of the totality of the circumstances or my application of the law under § 707(b).

[5] My Memorandum Opinion addressed not merely the tuition but also the additional expenses incurred for Caroline's enrichment and care. Debtors state that I erred in focusing on the additional costs of the Penn Charter after school program and its summer camp because as working parents, such additional care is required for their daughter. I do not dispute that there is of necessity a cost associated with child care for working parents. However, I disagree that it follows that the programs they have selected, just like the school they have selected, are in keeping with their other financial responsibilities. Moreover while James indicated that Penn Charter was not the most expensive camp they could have chosen, he gave no indication that other, and more economical, alternatives were investigated, including programs like the YMCA day camp which offers extended hours to obviate the additional cost of babysitting which they presently incur.

for their child have abused the law, I have apparently understated my conclusion that in a bankruptcy context such a decision is abusive as to creditors and cannot be permitted. See Educational Credit Management Corporation v. Savage (In re Savage), 311 B.R. 835, 841 n.9 (1st Cir. B.A.P. 2004) ("[P]rivate school tuition is most often considered a luxury expense that amounts to a debtor requiring his or her creditors to donate toward his children's education."). All caring parents desire the best education possible for their children. Regrettably, however, many parents simply cannot afford the cost and, consequently, are unable to provide it for their children. As the Bankruptcy Court stated in In re Stout, 336 B.R. 138 (Bankr. N.D. Iowa January 9, 2006):

> Debtor is not unusual in wishing to provide everything possible for his children's welfare. However, like most parents, Debtor must make decisions concerning what is affordable and what is simply financially unattainable.

Id. at 143.

In the bankruptcy context, a parent's wish for the best education for his child cannot take priority over, but instead must yield to, the objectives of the Bankruptcy Code, i.e., for debtors to pay creditors after satisfying their reasonable needs. In the bankruptcy context, absent a special need (i.e., physical or mental disabilities, religion, etc.), there is no justification for such a significant expense when a debtor's creditors will remain unpaid. Otherwise, the creditors would be in effect, forced to fund a private school education for the debtor's child. Watson v. Boyajian (In re Watson), 309 B.R. 652, 662 (1st Cir. B.A.P. 2004).

Debtors failed to show that any special need exists to justify their payment of $15,000 per year for their daughter's academic education.[6] Debtors presented evidence that, in 2002-2003, many of the students in their neighborhood public school, Mifflin Thomas School, were not proficient in reading and math, see Transcript at 31; Exhibit D-2 (No Child Left Behind School Report Card showing that in Grade 5, at Mifflin Thomas School, 50% of the students are not proficient or advanced in reading and 66.7% of the students are not proficient or advanced in math). While this evidence explains why the Debtors were motivated to send their daughter to another school, it does not show that their daughter cannot be satisfactorily educated in the neighborhood public school. In short, this evidence does not demonstrate that the allocation of $15,000 of after tax income for private school tuition is warranted.

The fact that the Debtors enrolled their daughter at the Penn Charter school before they filed for bankruptcy and that she had a difficult time making the transition to the school does not constitute a special need justifying the Debtor's current tuition expenditure. The record contains no evidence that their daughter could not make a transition to another

---

[6] Asked to explain his "reasons for choosing Penn Charter," Mr. Savoie testified:

> We went on school visits – Caroline went on school visits. And I watched how she interacted with the teachers and the students. And, um, to be frank, it was an intuitive reaction that, you know, she – this is a good place for her. The classes were small, 11 to 14 maximum. It just seemed like the right place. It also was across the street from where I work and near, you know, that's five blocks from our house.

Transcript at 34. Notably absent in this explanation is the mention of any "special need" which motivated the Debtors to send their daughter to the William Penn Charter School. They liked the school the best, and it was conveniently located to their home.

-7-

school. While it would, of course, be preferable for her to remain in the school to which she is accustomed, that is a luxury that her parents cannot provide while obtaining Chapter 7 bankruptcy relief. Many parents must make decisions that are not the "best" ones for their children because of their financial limitations and situations. The Debtors, in choosing to seek bankruptcy relief, must do likewise. See Educational Credit Management Corporation v. Savage (In re Savage), 311 B.R. at 841-42 (rejecting debtor's argument that private school tuition was a reasonably necessary living expense despite debtor's testimony that son woke up every morning crying that he didn't want to go to school, where debtor had not demonstrated that public school system could not adequately meet her son's educational needs); In re Stout, supra (granting § 707(b) motion where debtor, who had credit card debt of approximately $96,000, was spending $700 per month on home schooling absent any special need and $500 on skating per month for his daughter to encourage her self-esteem).

Nor does Mr. Savoie's preference for a non-Catholic education for his daughter constitute a "special need" justifying the Debtors' expenditure for private school tuition.[7] His preference in this regard obviously yielded to other priorities when he and his wife sent their daughter to St. Margaret's School in Narberth. Indeed, they utilized this Catholic parochial school for a full school year for their daughter even after they moved to

---

[7] Mr. Savoie testified that he and his wife decided against sending their daughter to St. Bridget's parochial school in the City because: (i) St. Bridget's was a "diminishing parish and so the school was in some trouble;" and (ii) Mr. Savoie "was not real comfortable sending his child to a Catholic school." Transcript at 33.

-8-

Case 05-13263-dws   Doc 32   Filed 03/09/06   Entered 03/10/06 16:29:35   Desc Main
                     Document      Page 9 of 16

Philadelphia in June of 2002.[8]  Moreover, during the hearing, Debtor testified that they "looked at several other schools" for their daughter in addition to William Penn Charter School. Transcript at 33. One of the other two schools which he named was Waldron Mercy Academy in Merion, Pennsylvania. Id. According to this school's website of which I take judicial notice, see http://www.waldronmercy.org/mission.shtml, this school is a private co-ed Catholic school which means that, when Debtors were considering private schools for their daughter, they hadn't ruled out her attendance at a Catholic school.[9] Based on these findings, I do not consider Mr. Savoi's preference for a non-Catholic school to be a significant "religious" reason for expending $15,000 for private school tuition when the Debtors' unsecured credit card debt will be wholly unpaid if they are given Chapter 7 relief.

---

[8] Debtor's testimony revealed that he and his wife never explored whether it was possible to send their daughter to a parochial school without having her participate in the religious education at the school. Mr. Savoie testified, in relevant part:

> A. ... I think one percent of the students in Saint Margaret's were non-Catholic.
>
> Q. ... What did they do with the kids who are not Catholic *vis-a-vis* to use your terms, indoctrination of religion. Do they exempt them?
>
> A. Um, I don't know.
>
> Q. You did not explore that?
>
> A. Uh, no I did not.

Transcript at 43.

[9] The current tuition for Waldron Mercy Academy is $8,550 ($8,400 for tuition and $150 for a technology fee). See http://www.waldronmercy.org/tuition.htm. Waldron's tuition, while substantial in and of itself, is significantly less than Penn Charter's tuition. To the extent that Debtors contend that I erred in concluding that they selected Penn Charter without regard to cost, this evidence supports that conclusion.

In sum, I remain firm in my holding in <u>Savoie I</u> that Debtors' expenditure of $15,000 for private school tuition to be a substantial abuse of Chapter 7 of the Bankruptcy Code.

IV.

The Debtors contend that I erred in granting the Dismissal Motion under § 707(b) given the particular needs of their daughter, the educational alternatives, their frugal lifestyle and their good faith in other respects. As explained above, Debtors did not provide evidence that their daughter has special or particular needs which justify their payment of $15,000 per year for her school tuition. They also failed to provide evidence that other educational alternatives are not available. They offered evidence (limited evidence at that) on only two other schools, namely the neighborhood public and parochial schools, for the purpose of showing these schools are not satisfactory. No other educational alternatives were discussed. However, Debtors also contend that the educational expense, without more, cannot establish substantial abuse. There must be an aggravating factor[s] such as a luxury lifestyle, nondisclosure of material information or some indicia of bad faith. I respectfully disagree.

While a debtor's good faith may certainly be considered by a court in deciding whether to grant a motion under § 707(b), a finding that good faith exists does not mandate the denial of such a motion. See <u>Savoie I</u>, 2005 WL 2476268, at *2 (explaining that a dismissal under § 707(b) can be predicated upon: (i) bad faith; or (ii) want of need/ability to pay). <u>See</u> also <u>In re Green</u>, Bankruptcy Case No. 04-10341, Slip op. at 7 (Bankr. E.D. Pa. Oct. 21, 1995) (Carey, J), (dismissing debtors' bankruptcy case under § 707(b) based on conclusion that, even though the debtors had not filed their petition in bad faith and their

expenses were not excessive or unreasonable, they fell within the category of "non-needy" debtors.). As I noted in Savoie I, courts have identified various factors that are relevant to a § 707(b) determination. See Savoie I, supra at *3 (*citing* In re Krohn, 886 F.2d 123, 126-27 (6th Cir. 1989) and Green v. Staples (In re Green), 934 F.2d 568, 571 (4th Cir. 1991)). "[I]n each case, the reasonableness of the debtor's expenditures is a material factor in the court's analysis." Savoie I, supra, at *3. See also In re Miller, 335 B.R. 335, 341 (Bankr. E.D. Pa. 2005) (*quoting* In re Attanasio, 218 B.R. 180, 184 (Bankr. N.D. Ala. 1998)) (adopting approach to § 707(b) that permits the court to consider "all of the evidence in the case, but also allows a court to recognize that '[a] vast majority of both courts and commentators have opined that a debtor's ability to pay is the *sine qua non* of section 707(b).'").

In Savoie I, I observed, *inter alia*, that: (i) the Debtors' bankruptcy case was not the result of a sudden illness, disability or recent unemployment but rather the consequence of years of spending beyond their means; (ii) they have had a stable source of income exceeding $100,000 for the past three years; and (iii) their expenses could be reduced significantly without depriving them of adequate food, shelter or other necessities. See Savoie I, supra, at *4. I concluded that Debtors do have the ability to pay their creditors under a Chapter 13 plan and to allow them to circumvent that obligation would be a substantial abuse of the bankruptcy law in this case.

Finally, I do not agree with Debtors' argument that given the amount that they are able to pay, requiring them to do so under a Chapter 13 plan is not justified when the consequence

-11-

is to deprive their daughter of her private school education. Since the student loan creditor will be paid in full in any event, they would have me conclude that the funds redirected from Caroline's education to repayment of essentially credit card debt is not warranted. I find no support in the law for the balancing approach they suggest, and rather believe the proper inquiry is whether Debtors can make a substantial distribution to their unsecured creditors. Debtors' Schedule J evidences a monthly payment of $750 for Mr. Savoie's student loans. See Exhibit T-1. While nondischargeable, the student loan debt "stands on the same footing as any other unsecured debt in the context of a § 707(b) analysis of a debtor's ability to pay." In re Schmonsees, 2001 WL 1699664, at *5 (Bankr. M.D. N.C. September 21, 2001). In a Chapter 13 plan, student loan creditors are limited to the same *pro rata* distribution as other unsecured creditors. In re Wessels, 311 B.R. 851, 853 (Bankr. N.D. Iowa 2004). At the end of the plan, however, any balance due on the student loans would likely be excepted from discharge. Id. Consequently, rather than being an expense, the $750 per month must be included in their income. See In re Schmonsees, 2001 WL 1699664, at *5 (treating $200 monthly expenditure for educational loan as being available for repaying unsecured debts); In re Lenartz, 263 B.R. 331, 337 (Bankr. D. Idaho 2001) (ruling that it is inappropriate to consider student loans as a monthly expense since the loans are nonpriority unsecured debts). Debtors do not dispute this conclusion.

With the monthly savings from private school of $1,220[10] plus the above referenced $750, Debtors' disposable income for three years could include $71,000 more than their

---

[10] The Debtors schedule monthly expenses of $1,220 or $14,640 for school tuition and expenses, somewhat less than the $15,000 referred to above.

Schedules indicate. Deducting 10% for the trustee's fees and costs related to a Chapter 13, a fund of as much as $64,000 could be created for distribution on account of unsecured claims of $140,303. As such, the Debtors could pay their unsecured creditors a dividend of approximately 45% pursuant to a 3 years plan.[11] Based on these calculations, the Debtors have the ability to repay a substantial portion of their unsecured debt.

Debtors argue that this calculation ignores the fact that the student loan creditor which would be paid in any event on its nondischargeable debt takes almost two thirds of the distribution under the Chapter 13 plan and the total amount to be paid out to other creditors is approximately $17,000.[12] Since the student loan must be paid in any event, Debtors suggest that I "factor out" these claims. Looking at it another way, Debtors would have me condone zero payment to creditors with dischargeable debts because the Debtors have a large nondischargeable obligation. While the Code certainly gives special recognition to student loan obligations by rendering them nondischargeable absent undue hardship, 11 U.S.C. § 523(a)(8), the Code does not permit discrimination between classes of claims. Chapter 13 plans that treat nondischargeable unsecured claims better than dischargeable ones are not confirmable. See, e.g., Groves v. LaBarge (In re Groves), 39 F.3d 212, 215 (8th Cir. 1994); McDonald v. Sperna (In re Sperna), 173 B.R. 654, 658 (9th Cir. BAP 1994); In re

---

[11] Debtors' analysis is more conservative, suggesting (but not proposing) a possible plan payment of $1,500 per month which would generate a dividend of 34.64%. I recognize that Debtors would have other costs for Caroline's care if the Penn Charter expenses were eliminated so that the funds available for a plan will be somewhat less than I have calculated (i.e., $1,970) although how much less would require speculation on my part. However, accepting Debtors' hypothetical 34.64% as the accurate distribution, it is still substantial enough to require its payment.

[12] This is based on a 34.64% dividend. At 45%, the dischargeable claims would be paid slightly more than $22,000.

-13-

-14-

Williams, 253 B.R. 220, 225-26 (Bankr. W.D. Tenn. 2000).  The bottom line is that Debtors have substantial income to pay into a Chapter 13 plan that will provide for creditors according to applicable provisions of the bankruptcy law.

An Order consistent with the foregoing Memorandum Opinion shall be entered.

DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated:  March 9, 2006

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| JAMES A. SAVOIE and | : | Bankruptcy No. 05-13263DWS |
| JENNIFER M. SAVOIE, | : | |
| | : | |
| Debtors. | : | |

# ORDER

**AND NOW**, this 9th day of March, 2006, upon consideration of the Debtor's motion ("Motion") for reconsideration of this Court's Order dated October 16, 2005 granting the Motion of the United States Trustee to Dismiss this Chapter 13 case for substantial abuse pursuant to 11 U.S.C. § 707(b), and after notice and an evidentiary hearing and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that the Motion is **DENIED**.

DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

-2-

<u>Copies to</u>:

Joshua Z. Goldblum
826 Bustleton Pike
Suite 101B
Feasterville, PA 19053

George M. Conway, Esquire
Office of the U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia, PA 19107

Gary Francis Seitz, Esquire
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE  19899